1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT
7          FOR THE NORTHERN DISTRICT OF CALIFORNIA
8

**United States District Court**
For the Northern District of California

9  SIGMA DYNAMICS, INC.,                    No. C 04-0569 MJJ

10              Plaintiff,           **ORDER DENYING DEFENDANT'S
                                     MOTION TO STRIKE AND GRANTING
11      v.                           DEFENDANT'S MOTION FOR
                                     SUMMARY JUDGMENT**
12  E.PIPHANY, INC.,

13              Defendant.
    _____/
14

15                        **INTRODUCTION**

16        Before the Court is Defendant Epiphany, Inc.'s ("Defendant") Motion for Summary

17  Judgment in this action for false advertising and unfair competition in violation of the Lanham Act

18  and California state law.  Plaintiff Sigma Dynamics, Inc. ("Plaintiff") opposes Defendant's motion.

19  Defendant also moves to strike the evidence Plaintiff attached to its Opposition to the Motion for

20  Summary Judgment.  For the following reasons, the Court **DENIES** Defendant's Motion to Strike

21  and **GRANTS** Defendant's Motion for Summary Judgment.

22                     **FACTUAL BACKGROUND**

23        Plaintiff was founded in August 2002 and provides enterprise software products that allow

24  businesses to make better decisions in real-time at specific points in enterprise business processes.

25  Defendant was founded in 1996 and develops, markets, and sells a series of customer relationship

26  management software ("CRM") products, called the Epiphany E.6 software suite ("E.6 Suite"), that

27  manages a business's marketing, sales and customer service.  Many of Plaintiff's employees are

28  former employees of Defendant.

United States District Court

For the Northern District of California

1    Included in Defendant's E.6 Suite is a product called Interaction Advisor, which is software

2    that allows a business to compare its stored information with new information provided by a

3    customer to predict the customer's needs in real-time during each customer call.  Both parties agree

4    that Plaintiff has created a product that competes directly with Defendant's Interaction Advisor.

5    Products in the CRM software market are differentiated between those that are written in

6    Java or are fully compliant with Java 2 Platform, Enterprise Edition ("J2EE") application sever

7    technology and those that are not.  J2EE is "a platform-independent, Java-centric environment from

8    Sun for developing, building and deploying Web-based enterprise applications online.  The J2EE

9    platform consists of a set of services, APIs, and protocols that provide the functionality for

10   developing multi tiered, Web-based applications."  Among the benefits of J2EE are that it provides

11   "a common programming language environment, standard system management capabilities, reuse of

12   standards-based connectors and a standard approach to clustering and failover."  The J2EE platform

13   is favored in the market.

14   It is undisputed that Interaction Advisor does not require a J2EE server to operate and can

15   operate in an environment where there are no significant J2EE components installed.  Additionally,

16   Interaction Advisor uses its own proprietary components to perform actions that a J2EE application

17   server would provide.  Indeed, Interaction Advisor is written in C++ programming language, but is

18   capable of interfacing with a J2EE-based program.

19   Plaintiff alleges that Defendant has made several false statements about its E.6 Suite in three

20   separate forums: 1) during earnings conference calls; 2) in public speeches and press releases; and 3)

21   on its website.  These include statements that the E.6 Suite is "all Java," or "fully Java," as well as

22   other statements to that effect.

23   Initially, Plaintiff alleges that Defendant's employees have made false statements in earnings

24   conference calls.  During an October 17, 2002 call, the President and Chief Operating Officer stated

25   that "[t]he launch of E.6 Service in August completed the E.6 Platform, the only component-based,

26   fully-J2EE complete CRM suite available."  Defendant's then CEO stated on January 23, 2003 that

27   Epiphany had delivered "one of the first end to end J2EE products and product platforms."  In an

28   
2

1   October 20, 2003 call, CEO Karen Richardson ("Richardson") stated that Epiphany provides "the

2   only full-footprint vendor who actually has a full J2EE architecture, and that doesn't mean that you

3   just, you know, cooperate with, I mean fully embedded from the ground up, all java, we're the only

4   vendor that has that . . . ."  Plaintiff also alleges that Defendant's 2002 Annual Report included a

5   statement referring to the E.6 Suite as "developed on [ ] J2EE development platform."

6          Additionally, Plaintiff alleges that Defendant made false statements in public speeches and

7   press releases.  On January 9, 2004 Richardson stated at the Sixth Annual Needham Growth

8   Conference that Defendant "spent about $100 million dollars rewriting the entire E.piphany platform

9   around a J2EE architecture . . . ."  In a January 14, 2003 press release, Defendant stated that the E.6

10  Suite provides "a fully integrated and certified one-vendor solution that delivers a true J2EE,

11  standards-based architecture."  In addition, Defendant issued other press releases stating "E.piphany

12  offers the only full-footprint CRM suite natively built on a service-oriented J2EE architecture," and,

13  in announcing the sale of software to a customer, that "real-time Interaction Advisor technology and

14  strong analytics, and our J2EE architecture were the key drivers for KLM to choose us as a partner."

15         Finally, Plaintiff contends that Defendant's website contains false statements about the E.6

16  Suite.  Defendant describes the E.6 Suite as follows: "Based on Java 2, Enterprise Edition (J2EE),

17  the E.piphany E.6 Platform offers openness, flexibility, security and scalability needed to power the

18  largest customer-focused organizations."  Beneath this language on the website is a description of

19  Interaction Advisor and a link for a demonstration of the software.  Defendant's website states that

20  the E.6 Suite is "[b]ased on the Java 2 platform," and that its technology has "full support for

21  standard J2EE application servers."  A search for the phrase "C++" on Defendant's website

22  produces two results, both under the "Jobs" section.

23         Plaintiff alleges that "E.piphany's misleading statements have caused prominent industry and

24  financial analysts to publish unfair product comparisons and reviews, which have compounded the

25  confusion caused by E.piphany's direct statements to customers and prospective customers and led

26  to unwise purchasing decisions by IT departments worldwide."  Such statements include that

27  Defendant "made a major R&D investment in the architecture of E.6, integrating a diverse set of in-

28

3

1 house-developed and acquired applications, implementing them consistently in Java, and deploying

2 them on a J2EE infrastructure."  Defendant subsequently issued a press release touting the analyst

3 report.  The same analyst issued another report stating that the E.6 Suite is "[b]uilt of collections of

4 EJBs and BIOs components that are specified in Java."  Another analyst report stated that Defendant

5 "continues to experience strong differentiation through its real-time recommendation engine.  The

6 E.6 rewrite of the application code base into J2EE appeals to the many enterprises pursuing a Web

7 services architecture."

**LEGAL STANDARD**

9        The summary judgment procedure is a method for promptly disposing of actions.  *See* FED.

10 R. CIV. P. 56.  The judgment sought will be granted if "there is no genuine issue as to any material

11 fact and [ ] the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "[A]

12 moving party without the ultimate burden of persuasion at trial [ ] may carry its initial burden of

13 production by either of two methods.  The moving party may produce evidence negating an essential

14 element of the nonmoving party's case, or, after suitable discovery, the moving party may show that

15 the nonmoving party does not have enough evidence of an essential element of its claim or defense

16 to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz*

17 *Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the movant meets its burden, the nonmoving

18 party must come forward with specific facts demonstrating a genuine factual issue for trial.

19 *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

20        If the nonmoving party fails to make a showing sufficient to establish the existence of an

21 element essential to that party's case, and on which that party will bear the burden of proof at trial,

22 "the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

23 317, 323 (1986).  In opposing summary judgment, the nonmoving party may not rest on his

24 pleadings.  Rather, the nonmoving party "must produce at least some 'significant probative evidence

25 tending to support the complaint.'"  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809

26 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290

27 (1968)).  It is not enough for the responding party to point to the mere allegations or denials

28

4

United States District Court

For the Northern District of California

1    contained in the pleadings.  Instead, it must set forth, by affidavit or other admissible evidence,

2    specific facts demonstrating the existence of an actual issue for trial.  The evidence must be more

3    than a mere "scintilla;" the responding party must show that the trier of fact could reasonably find in

4    its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

5           The Court does not make credibility determinations with respect to evidence offered, and is

6    required to draw all inferences in the light most favorable to the nonmoving party.  *See T.W. Elec.*,

7    809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587 ).  Summary judgment is therefore not

8    appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary

9    facts . . . ."  *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980).

10                                              **ANALYSIS**

11   **I.      Motion to Strike**

12          In its Reply Brief, Defendant included a Motion to Strike the evidence supporting Plaintiff's

13   Opposition as untimely submitted in violation of Federal Rule of Civil Procedure 26(e)(2).

14   Defendant contends that because Plaintiff failed to properly supplement its initial discovery

15   responses, and discovery is closed in this case, Plaintiff should not be able to present the challenged

16   evidence for the first time at summary judgment pursuant to Rule 37(c)(1).[1]

17          Federal Rule of Civil Procedure 26(e) states that a party is under a duty seasonably to amend

18   a prior response to an interrogatory, request for production, or request for admission if the party

19   learns that in some material respect the response is incomplete or incorrect and if the additional or

20   corrective information has not otherwise been made known to the other parties during the discovery

21   process or in writing.  FED. R. CIV. P. 26(e)(2).

22

23          [1]Plaintiff filed its initial disclosures on May 4, 2004 and its discovery responses on October 8,
     2004.  In its October 8 responses, Plaintiff objected to Defendant's requests for all documents relied on
24   in making the allegations asserted in its complaint, but stated that it would "produce all non-privileged
     publicly available documents in its possession, custody, or control that are responsive to this request."
25   Plaintiff never supplemented its initial disclosures.  Plaintiff filed its Opposition to Defendant's Motion
     for Summary Judgment on March 29, 2005. Accompanying Plaintiff's Opposition was over 1000 pages
26   of evidence submitted for the first time.  Included in this evidence are statements and documents that
     are responsive to Plaintiff's discovery requests regarding Plaintiff's basis for claiming that Defendant
27   caused consumer confusion and damaged Plaintiff's business.

28                                                    5

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Federal Rule of Civil Procedure 37(c)(1) states that a party that without substantial

2   justification fails to disclose information required by 26(e)(2) is not, unless such failure is harmless,

3   permitted to use as evidence on a motion any witness or information not so disclosed.  FED. R. CIV.

4   P. 37(c)(1).

5    After considering the parties' arguments, the Court find that Plaintiff's failure to supplement

6   its initial discovery responses was harmless under Rule 37(c)(1).  During oral argument, Defendant's

7   counsel focused solely on Plaintiff's failure to supplement its initial response to Interrogatory 18.

8   However, Defendant's counsel admitted that any information that Plaintiff failed to supplement in

9   response to Interrogatory 18, or any other discovery request, was ultimately flushed out during the

10  parties' briefing on the current summary judgment motion.  Accordingly, Plaintiff's failure to

11  supplement its interrogatory responses was not prejudicial to Defendant and was ultimately

12  harmless.  Therefore, the Court **DENIES** Defendant's Motion to Strike.

13  **II.     Lanham Act Claim**

14    Plaintiff alleges that Defendant falsely advertised Interaction Advisor through statements in

15  earnings conference calls to industry analysts, at industry-sponsored conferences, in press releases,

16  and on its website referring to the E.6 Suite as "fully Java."  There is no dispute that Defendant

17  made the allegedly false statements.  Rather, the dispute turns on whether Defendant made those

18  statements about Interaction Advisor or the broader E.6 Suite, and what meaning consumers give to

19  phrases such as "fully Java" or "based on J2EE architecture."

20     Section 43(a) of the Lanham Act establishes civil liability for any "false or misleading

21  description of fact, or false or misleading representation of fact, which . . . in commercial advertising

22  or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her or another

23  person's goods, services or commercial activities[.]"  15 U.S.C. § 1125(a)(1)(B).  The elements of a

24  Lanham Act section 43(a) false advertising claim are:

25       (1) a false statement of fact by the defendant in a commercial advertisement about its
         own or another's product; (2) the statement actually deceived or has the tendency to
26       deceive a substantial segment of its audience; (3) the deception is material, in that it is
         likely to influence the purchasing decision; (4) the defendant caused its false statement
27       to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as

28                                                      6

a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997) citing *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir.1990).

**A.    Commercial Advertisement**

Initially, in order to satisfy this first element, a plaintiff must show that the false statements were made in a commercial advertisement.  As statements in speeches, in press releases, and on websites are generally available to the public at large, they satisfy this element.  Defendant's statements during the earnings conference calls and in its 2002 Annual Report are the only statements at issue under this element.

The "core notion of commercial advertising is speech which does no more than propose a commercial transaction."  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993) (internal quotation marks omitted).  The Ninth Circuit has held that statements constitute commercial advertising if they are: 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services; and 4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.  *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).

The representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion."  *Id.*  Nevertheless, statements that may have an incidental effect of promoting goods to customers are not within the reach of the Lanham Act.  *See id.* (finding that a claim made by a television host during a show did not violate the Lanham Act because the claim was "part of the show itself" despite any incidental promotional or marketing effect).

There is no dispute that Defendant's statements are commercial speech and that Defendant is in competition with Plaintiff.  The central issues are whether Defendant made the earnings calls for the purpose of influencing customers and whether the statements made in the calls were disseminated sufficiently to the relevant purchasing public to constitute advertising in the software

7

industry.

"As a company with registered securities," Defendant's financial statements and earnings calls are "for the purpose of reporting its earnings results and financial condition to its investors or potential investors, not for the purpose of selling software." (Def. Mot. at 9.) Indeed, Defendant makes these earnings calls pursuant to regulatory requirements so that the community can "assess[ ] E.piphany's financial well-being." (First Amended Complaint ("FAC") ¶ 22.) Defendant contends that, as a necessary part of these calls, its products are discussed, but that this does not mean that the purpose of the calls is to promote the products.

Plaintiff alleges that Defendant "uses [the earnings conference calls] as events to promote and advertise its products." (*Id.*) Plaintiff, however, cites no evidence that the purpose of any of the statements in the earnings calls was to promote Defendant's products. (*See* Pla. Opp'n at 10–11.) Instead Plaintiff offers the conclusory assertion that, "Evident from the statements themselves, these public statements were made for the purpose of influencing consumers to buy E.piphany's products." (*Id.* at 11.) Moreover, Plaintiff fails to cite any evidence that the earnings calls or the 2002 Annual Report were disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion."

As the host's statements in *Rice* were "part of the show," Defendant's statements regarding its products in earnings calls were "part of the call." Moreover, because Plaintiff provides no evidence that the earnings calls or the 2002 Annual Report were disseminated to consumers, the Court **GRANTS** Defendant's Motion for Summary Judgment regarding statements made in earnings calls and in earnings reports. Thus, the only remaining statements at issue are those made in public speeches, in press releases, and on Defendant's website.

**B.     False Statements in Commercial Advertisements**

Plaintiff must show that the statements in public speeches, press releases, and on Defendant's website were false. "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, whether on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod*, 108

8

F.3d at 1139 (citing *Castrol Inc. v. Pennzoil*, 987 F.2d 939, 943, 946 (3d Cir.1993 ).  Plaintiff can

prove this element of its Lanham Act claim through either of these two avenues.

### 1.     Literally False

"When evaluating whether an advertising claim is literally false, the claim must always be

analyzed in its full context." *Castrol Inc.*, 987 F.2d at 946.  A statement is not false if "[i]t is beyond

the realm of reason to assert . . . that a reasonable consumer would interpret [the statement] as a

factual claim upon which he or she could rely." *Cook, Perkiss & Liehe, Inc.*, 911 F.2d at 246.

Here, the parties dispute what it means to state that software is "fully Java" or is "based on

Java architecture."  Initially, Defendant contends that it "never claimed that Interaction Advisor is

written in Java or is 'fully J2EE' complaint [sic]." (Def. Reply at 5.)  Instead, Defendant claims that

all of the statements that Plaintiff cites as being false are not explicitly about Interaction Advisor, the

only software at issue here, but are rather about the E.6 Suite, of which Interaction Advisor is merely

one component.  Thus, Defendant contends that referring to the E.6 Suite as "J2EE service-oriented

architecture" or  "J2EE based" does not mean that Interaction Advisor is written in J2EE.

Jonathan Miller, Defendant's Vice President of Product Marketing, states that "[i]n the

context of sales of CRM software, referring to a product as supporting Java interfaces would be

understood to mean that the product is J2EE compliant."  (Declaration of Jonathan Miller ¶ 7.)

Michael Adar, Plaintiff's Vice President, Product Development, disagrees, claiming "[t]his sentence

is absolutely false and misleading." (Declaration of Michael Adar ¶¶ 12–13, 20 and 22.)  Each of

the statements in question is subject to this basic disagreement.

Based upon the record before the Court, it is clear that Interaction Advisor is a central

component of the E.6 Suite.  Defendant admitted that it "has relied heavily on Interaction Advisor's

unique capabilities in marketing its software products to potential customers." (Def. Mot. at 2.)

Indeed, if Defendant claims that "[t]he E.6 Suite is the only full-footprint CRM Suite built on [J2EE]

standards," as it has done, and Interaction Advisor is a component of the E.6 Suite, then it follows

that Interaction Advisor is also "built on J2EE standards."  Therefore, the Court finds that genuine

issues of material fact exist regarding whether Defendant's statements about the E.6 Suite would be

9

1   reasonably understood to include Interaction Advisor.

2       Next, the parties dispute whether the presence of C++ code in Interaction Advisor affects the

3   veracity of Defendant's statement that E.6 Suite is based on a fully-J2EE architecture.   Defendant

4   asserts that it does not.  Plaintiff rebuts this contention, stating that "a product cannot be J2EE

5   unless, *inter alia*, the product is written in Java."  (Pla. Opp'n at 5.)  Additionally, Plaintiff argues

6   that "[f]rom a technical point of view, software architecture and software interface are two distinct

7   concepts.  The term 'software architecture' is commonly used to refer to the way software is built.

8   On the other hand, the term 'software interface' is used in the industry to refer to the way the

9   software interacts."  (Pla. Opp'n at 11.)

10      Defendant's President and COO stated as follows:

11          I have seen vendors quoted as saying they offer J2EE products, but in reality their
            software is written in C++.  Obviously, a product that is not even written in Java
12          cannot be J2EE.  But we find ourselves fighting a losing battle, because claims like
            this are given legitimacy in press reports and analyst reports.
13

14  Based on this statement, it appears that Defendant recognizes that companies saying they offer J2EE

15  products, when in reality their software is written in C++, are making false statements.

16  Nevertheless, Defendant contends that its statements are not false because they merely refer to the

17  E.6 Suite's J2EE "architecture," which, in the CRM industry, can still allow for components written

18  in C++.  Based on the arguments of the parties, the Court finds that an issue of fact exists regarding

19  whether Defendant's statements about the E.6 Suite are literally false.

20      In sum, the Court finds that there are issues of fact with respect to whether Defendant's

21  statements regarding "fully java" and "J2EE compliant" reference the E.6 Suite only, or rather,

22  would be understood to cover Interaction Advisor.  Furthermore, because Interaction Advisor is

23  written in C++ language, there is also an issue of fact regarding whether Defendant's statements

24  regarding the E.6 Suite are literally false.  Moreover, at summary judgment, the Court is unable to

25  make determinations of credibility, which it would be forced to do in evaluating the competing

26  declarations supporting each party's assertions.  *See T.W. Elec.*, 809 F.2d 630-31.  Therefore, the

27  Court finds that there is a triable issue of material fact such that a reasonable jury could conclude

28

United States District Court

For the Northern District of California

10

1   that Defendant's statements were literally false.[2]

2       **2.      Materiality**

3       Creating an issue of material fact regarding literal falsity is crucial to the rest of the analysis

4   of a Lanham Act claim.  Although Ninth Circuit precedent is somewhat unclear, the Court finds that,

5   to survive summary judgment, even where there is a material issue of fact as to whether Defendant's

6   statements were literally false, Plaintiff must still create a material issue of fact as to whether those

7   statements were material.

8       "[C]ourts increasingly use materiality as a means of eliminating cases before trial, even

9   where the court has held that the defendant's factual representation is literally false."  4 J. THOMAS

10  MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:35 at 27-63 (4th ed.

11  2005).  In *William H. Morris*, where the Court found Defendant's statements were literally

12  false—Defendant stated it sued Plaintiff three times when it had only sued twice—it held that the

13  statement "would be unlikely to influence [consumers] purchasing decisions . . . ."  66 F.3d at 257;

14  *see also Rice*, 330 F.3d at 1181 (finding that although statements on video jacket were literally false,

15  those statements were immaterial to the purchasing decision).

16      Decisions from other Circuits confirm this approach.  In *Nat'l Basketball Ass'n v. Motorola,*

17  *Inc.*, 105 F.3d 841 (2nd Cir. 1997), the court found that, in addition to proving falsity, "a plaintiff

18  must also show that defendants 'misrepresented an "inherent quality or characteristic"' of the

19  product."  *Id.* at 855 (citation omitted).  "This requirement is essentially one of materiality . . . ."  *Id.*

20  (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir.

21  1994)).  The First Circuit, in *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302

22  (1st Cir. 2002), took a similar approach and stated as follows:

23      Whether a misrepresentation is material has nothing to do with the nature of the relief

24  _____

25      [2]Because the Court finds that there is a genuine issue of material fact regarding the literal truth
    of Defendant's statements, the Court also finds that Plaintiff has raised a triable issue of material fact
26  regarding consumers' actual deception or tendency to deceive.  *See Johnson & Johnson-Merck
    Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3rd. Cir. 1994) ("If
27  a plaintiff proves a challenged claim is literally false, a court may grant relief without considering
    whether the buying public was mislead.")

28

United States District Court

For the Northern District of California

sought or the defendant's intent.  Rather, materiality focuses on whether the false or misleading statement is likely to make a difference to purchasers. (citing to J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:35 (4th ed. 2001).  Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers.

*Id.* at 312 n.10.

"The standards by which the Court must judge materiality are not well-settled.  Some cases suggest that materiality may be measured by examining the subject matter of the advertisement." *In re Century 21-Re/Max Real Estate Adver. Claims Litig*, 882 F. Supp. 915, 923 (C.D. Cal. 1994); *see also In re Uranium Antitrust Litig.* 473 F. Supp. 393, 408 (N.D. Ill. 1979) (allegation that company misrepresented its uranium supply capability to its utility customers; Court looked to whether the advertising "relates to the principal bases of competition among sellers").  In *In re Century 21*, the court addressed statements in advertisements that one real estate company was superior to another. 882 F. Supp. at 923–24.  To show that the statements were material under the Lanham Act, the plaintiff introduced a field survey showing that 57% of the people who read the ad said they were more likely to use the defendant's service and 19% said they were less likely to use the plaintiff's service.  *Id.* at 924.  The Court found that:

> [t]his evidence does not establish whether the offending language in the ad affected purchasing decision—it shows at most that the ad as a whole affects the decisions. *Cook, Perkiss and Liehe* requires that the 'deception is material,' not that the advertisement as a whole is material.  Thus, without any relevant evidence that the claims at issue in the ad and the letter were likely to affect the purchasing decision of consumers, [defendant] prevails on this element.

*Id.*

In this case, both parties agree that J2EE "relates to the principal bases of competition among sellers" and is central to the "inherent quality" of CRM software.  Defendant contends that in order to show that any false statements materially influenced the purchasing decision, Plaintiff must produce evidence of individual customers who bought Interaction Advisor thinking it is written in J2EE.

Defendant cites two Ninth Circuit cases to support its argument.  Defendant initially cites to

*William H. Morris*, where a dietary supplement distributor wrote a letter to pharmacists stating that it had sued its competitor three times for copyright infringement.  66 F.3d at 257.  Plaintiff claimed that the statement was false because the defendant had only sued to protect its rights two times.  *Id.*  The court held that a statement regarding the number of lawsuits a company had filed was not material as a matter of law because it was unlikely to influence the relevant consumers' purchasing decisions.  *Id.*

Defendant next cites to *Rice v. Fox Broadcasting Co.*, in which the Ninth Circuit found that statements made on the jacket of a video sold on television, which the customer could not see until after the purchase, were not material to the customers' buying decision.  330 F.3d at 1181.  The *Rice* court held that "because there is no evidence that a potential customer could view the offending videotape jacket prior to purchase, any deception relating to advertisement of the videos must be immaterial."  *Id.*

The Court finds that Defendants reliance on these two cases is misplaced.  In *William H. Morris Co.*, the court reasoned that the statements regarding lawsuits were not material because it was unlikely to influence the relevant consumers' purchasing decisions.  Here, however, neither party disputes that J2EE is central to consumers' purchasing decisions.  Moreover, in *Rice*, all that the court required was that a "potential customer could view" the false statement, not that an actual customer did view it.  In the instant lawsuit, it is certainly possible that consumers had access to Defendant's statements prior to making their purchasing decision.  Thus, potential customers could have viewed Defendant's statements prior to making a purchasing decision.

Nevertheless, Plaintiff has presented no evidence that individual consumers of Defendant's products actually believed that Interaction Advisor was written in J2EE.  Instead, Plaintiff states that J2EE is "an industry standard" and that "[t]he natural consequence of this current trend towards J2EE is that the purchasing decisions of CRM software consumers will be heavily influenced by whether or not the software is J2EE compliant."  (Pla. Opp'n at 20.)  Plaintiff then cites several of Defendant's own statements and analyst reports to show that "one of the major differentiators of CRM software available in the marketplace is whether or not the software is based on J2EE

13

architecture." Plaintiff does not, however, cite any legal authority to support the argument that only general information regarding the relevant market meets the standard of materiality in a Lanham Act claim.

Furthermore, Plaintiff cannot rebut Defendant's claim that every customer who buys the E.6 Suite is aware that Interaction Advisor is written in C++. The proper inquiry is whether the "deception is material," not whether the statements themselves were material. *In re Century 21*, 882 F. Supp. at 924.

Here, assuming that Defendant's statements were material, it is undisputed that the deception was *not* material to the purchasing decision because each consumer was explicitly informed, prior to the purchasing decision, that Interaction Advisor was written in C++. If any consumer deception did exist, it did not remain at the time of the purchasing decision, which is the point of inquiry under the Lanham Act.

Thus, any statements in public speeches, press releases, or on Defendant's website touting Interaction Advisor as "fully J2EE," cannot amount to deception that was "likely to influence the purchasing decision." *See Jarrow Formulas, Inc.*, 304 F.3d at 835 n.4. Plaintiff has not shown that those consumers who actually did make a purchasing decision did so without full disclosure that Interaction Advisor is written in C++. Stated differently, Plaintiff has not shown that consumers made their purchasing decision because of an erroneous material belief that Interaction Advisor is written in J2EE. Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment relating to the remaining statements at issue—those made in public speeches, press releases, and on its website.

**II.     State Law Claims**

Both parties agree that Plaintiffs state law claims are subject to the same result as its Lanham Act claim. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's state law claims.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Strike and **GRANTS**

14

1  Defendant's Motion for Summary Judgment.  The Clerk of Court shall close the file.

2

3      **IT IS SO ORDERED.**

4

5

6  Dated: May__31__, 2005            /s/
                                MARTIN J. JENKINS
7                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

15